## LEKTOPHONE CORPORATION v. CROSLEY RADIO CORPORATION.

### No. 404.

District Court, S. D. Ohio, W. D.
Feb. 27, 1928.

William H. Davis, of Pennie, Davis, Marvin & Edmonds, and John F. Neary, of Hoguet & Neary, both of New York City, and Murray & Zugelter, of Cincinnati, Ohio, for plaintiff.

Marston Allen, of Allen & Allen, of Cincinnati, Ohio, Thomas G. Haight, of Jersey City, N. J., Giles W. Rich, of New York City, and Charles Sawyer, of Dinsmore, Shohl & Sawyer, of Cincinnati, Ohio, for defendant.

HICKENLOOPER, District Judge.

The present action is the usual suit for infringement of patent. The two patents in issue are No. 1,271,527 to Hopkins, July 2, 1918, claims 29 and 30, and No. 1,271,529 to Hopkins, July 2, 1918, claims 1, 2, 3, 4, and 8. Issued on the same day, these patents have been given reverse order in importance, and No. 1,271,529 is spoken of as the first patent and No. 1,271,527, adding an element to the combination claimed in the other, is spoken of as the second patent to Hopkins. It is freely conceded that if patent No. 1,-271,529 is invalid or not infringed, patent No. 1,271,527 must likewise be held invalid or not infringed. The defenses asserted are invalidity and noninfringement.

Both patents cover acoustic or sound-producing means consisting of a diaphragm or tympanum operating directly upon unconfined air and producing vibrations or sound waves for the reproduction of sound. Both were originally applicable to the reproduction of sound from a phonograph record, the vibrations being transmitted from such record to the diaphragm by sensitive mechanical means. Both use the conical diaphragm in combination with other elements to produce sound waves in the free air as distinguished from the use of sound box and amplifying horn. No outstanding commercial success in connection with the phonograph is shown by the evidence, but, with the development of the radio, the demand for loud-speakers operating in unconfined air in preference to sound box and horn loud-speakers or earphones, and the use of electromagnetic vibrating means, the patent is now claimed to blanket the manufacture and use of all conical loud-speakers of paper in which any means whatever are used at the periphery of the conical portion of the diaphragm to prevent deformity and resulting irregular and accidental sounds. A precise definition of the scope of the patent monopoly is thus of great commercial importance.

The question of validity of the patents in suit has been passed upon by the Circuit Courts of Appeals of the Second and Third Circuits, as well as by several District Courts in the issuance of temporary injunctions. See Lektophone Corp. v. Sylo Lighting Fixture Co. (D. C.) 11 F.(2d) 421, 422, and the same case on appeal 16 F.(2d) 7 (C. C. A. 2); Lektophone Corp. v. Western Electric Co., 20 F.(2d) 150 (D. C. N. Y.), same case on appeal 16 F.(2d) 10 (C. C. A. 2); Lektophone Corp. v. Brandes Products Corp., 20 F.(2d) 155, 156 (C. C. A. 3), reversing Lektophone Corp. v. Brandes Products Corp., 16 F.(2d) 934 (D. C. N. J.). Under these circumstances the court does not now reexamine the question of validity, but accepts the conclusion of the cases cited that patent No. 1,271,529 is valid if construed as and limited to a combination comprising three

elements, viz. (as stated in the Sylo Case): "(a) A large, stiff, light cone of vibratile material, freely exposed to unconfined air and of sufficient area to impart to the surrounding free air, when vibrated, sound waves substantially corresponding in intensity to the original sound waves; (b) a rigid support; and (c) an annular rim interposed between the rigid support and the conical portion, to maintain the place of the conical active portion, and yield sufficiently to permit the required motion of the conical portion, resisting displacement of the conical portion in just that degree necessary to maintain the form and neutral position of the active conical portion."

Of the claims in suit, claim 8 offers the best foundation for complainant's argument and may be quoted as typical: "8. An acoustic device, comprising a tympanum embodying a bodily movable, central conical portion, and an annular rim which encircles said conical portion and which is rigidly supported, said conical portion being freely exposed on all sides to unconfined air and being of sufficient area to produce self-sustaining sound waves in the surrounding air when vibrated, substantially as described."

This claim and the others, read in the light of the specifications and teachings of Hopkins, fully support the summary of the scope and nature of the patent, in each of the claims of which all three elements of the combination appear either expressly or by necessary implication.

The defendant's conical loud-speaker consists of a large, stiff, light cone of vibratile material, freely exposed to unconfined air, and of sufficient area to impart to the surrounding free air, when vibrated, sound waves substantially corresponding in intensity to the original sound waves. We therefore have the first element of the combination as summarized. The periphery or base of the cone does not, however, terminate in an annular rim interposed between the rigid support and the conical portion. On the contrary, the cone passes at its periphery or base, loosely and yieldingly, between layers of felt which are affixed to either interior side of a two-piece tubular metallic ring in which a segment is removed for entrance of the cone without touching the metal. The support of the tympanum at its periphery is therefore not rigid in the sense of support between the ponderous rings of the Hopkins patent, and the annular rim of the tympanum is entirely missing unless recourse may be had to the doctrine of mechanical equivalents.

The decision of the case is freely conceded by the complainant to rest upon this question of equivalents.

Counsel for complainant describe the nature of Hopkins' invention as follows: "It must become apparent that Hopkins' invention did not reside in the choice of a particular type of flexible connection (viz., between the cone and rigid support), but in the broader concept of a conical paper sound producer of large area acting directly on free air and supported at its edge from a rigid frame by an interposed flexible rim." "He discovered and disclosed for the first time," it is urged, "as Judge Buffington said, the combination of a conical shaped paper device of proper size, provided with flexible edges, coupled to a rigid frame used in free air." Thus it is argued that, this being his concept and contribution to the art, and the description of the annular rim portion of the diaphragm and the express inclusion of this element in each of the claims being simply the pointing out or description of the "best mode" in which he contemplated applying the principle of his invention, or the preferred form of its embodiment, as required by Rev. St. § 4888 (35 USCA § 33), the patentee would be entitled under the doctrine of Winans v. Denmead, 15 How. 330, 14 L. Ed. 717, and the cases following it, to that range of equivalents which would protect his monopoly to the full extent of the advance he has made; that is, the true function of the annular rim being to avoid deformity at the base of the cone and the impure sounds incidental thereto, any means in connection with a paper cone of Hopkins' dimensions and interposed between the cone and its circular support, which means accomplished the same result as the annular rim, would fall within the scope of equivalents properly to be allowed the patentee.

This would be so provided (1) the form the patentee describes is not, in fact, of the essence of his invention; or (2) he has not expressly limited himself to the form claimed and described; or (3) unless it is necessary to limit him to the specific form in order to save the validity of his patent. All of these exceptions, narrowing the application of the doctrine of equivalents, arise, if at all, when the patentee enters a crowded art, and an examination of the state of the art and the nature of the advance made is therefore of first importance.

The arts of sound box and amplifying horn, on the one hand, and of sounding

boards or diaphragms operating in unconfined air, on the other, cannot be considered as wholly independent and distinct of each other. Both lie in the domain of acoustics, and both involve the same principles for reproduction of pure sound. It is the vibration of the diaphragm in each which produces the sound waves, and diaphragms of larger dimension may be constructed with sound box and amplifying horn, or those of smaller dimension operated in unconfined free air with smaller volume of sound, it is true, but with good quality. Telephone receiving instruments, while classified by counsel as in the sound box art, operate upon unconfined air in an acoustic sense. In the case of both the same fundamental principles apply. What then was the precise contribution of Hopkins to the art of sound reproduction?

Apart from the specific form of his diaphragm, Hopkins was not the first to discover the dimensions to which diaphragms, theretofore used in connection with sound box and amplifying means, could be increased in order to satisfactorily operate in unconfined air. Types of such enlarged single plane diaphragms are shown in the German patent to Dr. Asam (No. 152,955—1903) and the French patent to Ader (No. 127,180—1878); of the cone type in Talking Machine News of July, 1907 (article by Starling and Cole), and probably the British patent to Stroh (No. 9,418—1899). The diaphragm of the United States patent to Lumiere, No. 1,036,529, of 1912, may perhaps be considered strictly neither a plane surface diaphragm nor a cone; but it was Lumiere who pointed out so emphatically that, if the surface to be vibrated be brought "into molecular stress by torsion" (stiffened) "so that the surface or surfaces of the diaphragm will vibrate as a whole," the tendency to produce nodes and blasting will be reduced to a minimum, and the diaphragm may be increased in size so as to operate in unconfined air.

Lumiere's teachings are worthy of special notice. Among the purposes of his invention we find: "To increase the diameter of the diaphragm without making it liable to vibrate in parts, or to set up nodes or inactive portions in the diaphragm, or, in other words, to substantially increase the size of the diaphragm and, at the same time, have it vibrate throughout." Page 1, lines 43–51. Again, "I have found, however, that I am able to make a diaphragm according to the present invention, as large as ten inches or more in diameter, without impairing the quality of the reproduction, and by means of

this diaphragm, I at the same time, attain a much greater volume of sound than with the smaller diaphragm. This amplification of the sound, I believe to be due, not only to the increased diameter of the diaphragm, but also to the increased surface area of the diaphragm produced in the construction above described, by the plaitings or crimpings or folds in the material of the diaphragm; this appears to have the effect of putting into motion a greater volume of sound." Page 3, lines 35–52.

Throughout the entire specifications Lumiere points out the advantages of a diaphragm of freely responsive surface "and also of an aggregate area substantially larger than a plane disk of the same diameter" (a cone is this), and recognizes that such a diaphragm may be produced in other ways than described. See page 3, lines 53–62. As described, his diaphragm is flattened toward its outer edge "until at its perimeter the diaphragm lies in one plane," and this perimeter is rigidly held "between clamping rings, as shown in Figs. 7 to 11." Page 2, line 48; page 3, line 84; page 4, lines 60 to 75.

Charged with full knowledge of these teachings and in view of the facts that paper diaphragms were old in the art of sound reproduction (Lumiere, United States patents 986,477 and 1,036,529; Starling and Cole, 1907; English, United States patent No. 1,064,062; Hogan, United States patent No. 632,015, 1899; Head, United States patent No. 805,544, 1905, etc.), that an unrestrained edge of a conical diaphragm was known to produce "impure sound," and that such conical diaphragms with edges restrained against deformity, although used in connection with sound box and amplifying means or of a smaller size acting on unconfined air, were also old in the art (see especially British patent to Stroh, No. 3,393, of 1901; also, United States patent to English, No. 1,064,062, of 1913; United States patent to Elfering, No. 1,182,078, of 1916; United States patent to Kraemer, No. 890,142, of 1908), there was nothing new in the organization of Hopkins either in the increase in size, the use of paper, the conical shape, the annular rim, or the fact that the cone "vibrated as a whole" (see English, supra; Stroh, British patent No. 3,393; British patents to Brown, No. 29,833, of 1910, and No. 1,157, of 1911; Lumiere, supra). What Hopkins did was no more than to take the diaphragms of Stroh, English, Brown, Kraemer, and Elfering, with their cones terminating in annular rims (English specifically says: "The marginal portion

of the diaphragm is preferably in the form of a flat annulus, arranged in a plane perpendicular to the longitudinal axis of the sound box") and enlarge such diaphragms according to the teachings of Lumiere that the increased surface area afforded by the cone would result in increased sound production.

Even if the Hopkins patent can be read as teaching that the base of the cone must be restrained against weaving, fluttering, or forming loops and nodes, in order to produce a satisfactory result, Hopkins was not the first to so teach. This teaching is clearly disclosed by Stroh (British patent No. 3,392 —1901), and the practice of so restraining the base of the conical portion of the diaphragm was employed and the subject of patent publication by English, Brown, and others, including Lumiere, without detailed reference to the function of such annulus or plane rim. We cannot concur in the apparent opinion of the Court of Appeals of the Third Circuit (Brandes Case) that "Hopkins was the first to point out that this blasting effect, caused by the local vibrations at the edge of the cone, would be prevented and the cone held restricted to vibrations as a whole, and the weaving prevented, by the expedient of using a rigid frame and making a liaison between the edges of the cone and the clamp of the rigid frame by a flexible yielding liaison belt." Stroh specifically taught this, but not Hopkins. Hopkins was the first to apply for patent for a sounding board, operating in free air, of the dimensions, form, and proportions described and claimed by him; and it was this fact that probably led to the grant of his patent. None before him had made a diaphragm of paper, of such large size, with a central conical portion and annular rim and held rigidly in clamping rings, and as the first he was granted a monopoly of this device. But all of these elements in combination went to make up the novelty of his alleged invention. The form, shape, size, material, and proportions were all of the very essence of his invention. The necessity of restricting the edge or base of the cone against deformity was not of the essence because it was old. The details of shape and dimensions pertained especially to the inventive step rather than to mere environment, were so considered by the patentee and so precisely claimed. To the size, shape, and proportions thus disclosed the patentee is limited by the prior art and the very essence of his invention. D'Arcy Spring Co. v. Marshall Ventilated Mattress Co., 259 F.

236, 240 (C. C. A. 6); Lakewood Engineering Co. v. Stein, 8 F.(2d) 713 (C. C. A. 6).

That Hopkins himself so considered the nature of his invention is also disclosed by the contents of the file wrapper. Claims of ultrabroad scope having been repeatedly rejected on reference to Stroh, English, Brown, Kraemer, etc., in view of Lumiere and the Patent Office opinion that they were too indefinite and that "the size of the diaphragm is held not a patentable limitation," the applicant inserted into the claims all the specific and detailed limitations as to form and shape. In his response to official action of March 4, 1916, received in the Patent Office March 28, 1916 (file wrapper, p. 86) he says:

"It is essential to the success of applicant's machine that the tympanum be of large area and that the base of the vibratile portion thereof exceed nine inches in diameter, and furthermore that the peripheral edge of the tympanum, exterior of the vibratile portion, be rigidly secured or tightly gripped between the rings of the supporting frame. These definitions of the essential characteristics of the invention have been included in the claims by the amendments aforesaid, and said claims are, therefore, believed to be allowable."

Not only is this a most emphatic statement by the patentee of what he considered to be the precise nature of his invention and the proper scope of his claims, bringing him clearly within the doctrine that that which is not claimed must be considered as abandoned [1] and the scope of the claims limited to their plain intended purport,[2] but, coming as it did at the end of repeated rejections of the original claims on reference, it also brings the patentee within the estoppel by amendment, so clearly defined recently by the Supreme Court in I. T. S. Rubber Co. v. Essex Rubber Co., 272 U. S. 429, 443, 47 S. Ct. 136, 71 L. Ed. 335. And the patent in suit has been so restricted to the specific structure in the prior litigation thereon. See Judge Campbell in the Sylo Case (D. C.) 11 F.(2d) 421, 422, and Judge Thacher in the Western Electric Case (D. C.) 20 F.(2d) 150.

The essential importance of the annular rim, rigidly held by the ponderous rings, in

---

[1] Miller v. Brass Co., 104 U. S. 350, 26 L. Ed. 783; Mahn v. Harwood, 112 U. S. 354, 361, 5 S. Ct. 174, 6 S. Ct. 451, 28 L. Ed. 665; McClain v. Ortmayer, 141 U. S. 419, 423, 424, 12 S. Ct. 76, 35 L. Ed. 800; Deering v. Winona Harvester Works, 155 U. S. 286, 15 S. Ct. 118, 39 L. Ed. 153.

[2] Keystone Bridge Co. v. Phoenix Iron Co., 95 U. S. 274, 278, 24 L. Ed. 344; White v. Dunbar, 119 U. S. 47, 7 S. Ct. 72, 30 L. Ed. 303; Coupe v. Royer, 155 U. S. 565, 576, 15 S. Ct. 199, 39 L. Ed. 263.

the mind of the patentee, is further emphasized by the original application, where he states: "The plane peripheral portion 1 of the tympanum maintains the place of the conical active portion of the tympanum and yields sufficiently to permit of the required motion of the conical portion, resisting, however, displacement of the conical portion in just that degree necessary to maintain the form and neutral position of the active conical portion. Were the plane peripheral portion 1 of considerably greater width or markedly narrower than described, its function would be destroyed to a degree corresponding to the remoteness (degree?) of the departure from the approximate proportion given and the effective portion of the conical portion of the tympanum would be proportionately lessened."

Again, the applicant had previously stated: " The conical shape is given the tympanum so that shocks or vibrations impressed upon the apex of the cone in a direction toward its base will move the whole cone bodily, the strains being imparted edgewise of the material and no wave motions being set up in the thin material of the cone."

It is perhaps immaterial that the applicant misconceived the true effect of the annular rim in both particulars. Circular flexural waves are set up in the cone passing radially from the apex to the base, and the cone is supported, impelled axially, and retracted by the rod V. and the cap M. So, too, most of the energy of the impact is consumed by the vibratile nature of the material of the cone, so that there is not "bodily movement as a whole," in an exact sense. Though the patentee need not thoroughly understand the scientific principles of operation of his invention, these passages show emphatically that Hopkins considered the annular rim and its rigid support as of the very essence of his invention, and their functions indispensable, and that he felt he was losing nothing by the amendments and the estoppel which they created. It will not do now to speak of these only as "preferred forms" and "environment."

█ We therefore hold that by the prior art, by the claims as drawn, by the essence and exact nature of the invention as disclosed, and by the estoppel created in the Patent Office proceedings, the patentee here is limited to a diaphragm having the annular rim, rigidly held, and to a comparatively narrow range of equivalents. The loose rubber ring of Brandes may be such equivalent, but the total absence of any annulus cannot be so considered.

█ Nor in the alleged infringing device of the present case do we find any element accomplishing the same function as the Hopkins annular rim, in the same or substantially the same manner. Cf. Westinghouse v. Boyden, 170 U. S. 537, 569, 18 S. Ct. 707, 42 L. Ed. 1136. It is contended that the felt lining of the metal frame is the mechanical equivalent of the annular rim of Hopkins. The alleged infringing device, however, lacks the permanent physical connection between the cone and the felt. If prevented or restrained at all by the protruding hairs of the felt, such restraint is infinitely less acoustically and mechanically than that of the annular rim of Hopkins. The annular rim of Hopkins forms a part of the tympanum or diaphragm and is acoustically active, permitting the flexural waves to pass to and beyond the point of junction. The felt of the alleged infringing device is acoustically inactive and an absorber of sound waves, permitting only such reflection as is incident to such flexural waves reaching a free edge. It is also claimed that the annular rim of Hopkins operates as a spring tending or assisting to return the cone to neutral position. This resultant function is entirely lacking in the alleged infringing device, in that the edge of the cone does not press upon the felt, but is loosely or yieldingly held between the two layers. The contention that the protruding hairs of the felt operate to produce actual resilience or spring effect is, we think, more fanciful than real. The annular rim of Hopkins is said to support the cone, and is in turn rigidly supported by the rings K, K'. The cone of the defendant is supported rigidly at its apex, and the felt operates only as against gravity or undue deformation. There is no rigid support of the tympanum in the sense that this is used by Hopkins.

The defendant has done no more than to draw from the prior art, albeit including Hopkins, the various elements, themselves all old, which accomplish to a material extent the desired results which it is claimed Hopkins accomplished, but by a combination of elements differing radically from the Hopkins combination in at least this one respect. Hopkins nowhere taught the necessity of, or claimed as an element of his invention, means for restricting the edge of the cone against deformation. This was an incidental or accidental function of his annular rim, but there are many ways of accomplishing the same result. Hopkins chose one; the de-

fendant another. So long as the defendant's means of accomplishing the desired result is not merely the substitution of the mechanical equivalent for that of Hopkins, there can be no infringement.

Limited and narrowed as we find the claims of Hopkins must be, and different in nature, function, and operation as we understand the felt channel at the base of the cone of the defendant to be, from the annular rim of Hopkins, we are constrained to hold that, conceding the validity of the complainant's patents (not re-examined and upon which we give no opinion), there has been here no infringement.

The bill must be dismissed on the ground of noninfringement.